# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

<table>
<tr><td>

THAIS ORTOLAZA *ex rel* E., a minor child,

           Plaintiff,

v.

CAPITOL REGION EDUCATION
COUNCIL; ROBERT McCAIN; TIMOTHY
SULLIVAN; CHRISTOPHER NOLAN;
BRIAN GUSTIS; EZEKIAL M.
DONNELLY; MARC DaCRUZ; CARLOS
TORRES; JOSEPH BUYAK; IAN
POWELL; BENJAMIN LEE; NICHOLAS
TRIGILA; and THE CITY OF HARTFORD,

           Defendants.

</td><td>

3:17-cv-01885 (CSH)

**MAY 23, 2019**

</td></tr>
</table>

## RULING ON CREC DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

**HAIGHT, Senior District Judge:**

This action alleges violation of civil rights and seeks recovery from several defendants pursuant to 42 U.S.C. § 1983. Those federal claims are accompanied by state law tort claims, asserted under supplemental jurisdiction, 28 U.S.C. § 1367. Plaintiff Thais Ortolaza sues as the mother and on behalf of her minor child, E., who at the pertinent times was a student at the Two Rivers Magnet High School ("Two Rivers" or "the School") in Hartford, Connecticut.

The case is before the Court on the motion of one of two groups of Defendants to dismiss an Amended Complaint which Plaintiff filed pursuant to leave granted by the Court in a prior Ruling.

# BACKGROUND

The case arose when during the morning of November 19, 2015, E. was removed by officers of the Hartford Police Department ("HPD") from a school bus carrying students to Two Rivers. E. was arrested on a charge of sending a threatening email to the School principal, detained for about an hour, and then released, without further charge or action against him. This action, filed by E.'s mother, followed.

Plaintiff's initial complaint alleged claims against two groups of Defendants. The first group consists of the Capitol Region Education Council ("CREC"), the administrator of Two Rivers, and three CREC officers or employees (collectively, "the CREC Defendants."). The second group of Defendants consists of officers of varying ranks in the Hartford Police Department (collectively, "the Hartford Defendants").

The CREC Defendants moved to dismiss certain counts in the complaint against them. The Hartford Defendants did not join in that motion. The Court granted the CREC motion in an opinion reported at 2018 WL 2100280 (D. Conn. May 7, 2018) ("the May 7 Ruling"), familiarity with which is assumed. The Court dismissed Plaintiff's federal § 1983 claims against the CREC Defendants without prejudice and with leave to amend, and dismissed the state law claims against those Defendants without prejudice, with the provision that a particular state law claim could be reinstated "if the Plaintiff files an amended complaint which alleges a viable federal claim." *Id.* at *13. The May 7 Ruling dismissed Plaintiff's § 1983 claim against the CREC Defendants for the principal reason that "the form and substance of communication between private parties and the police pleaded by this complaint does not suffice to make the private party a *state actor*." *Id.* at *10.

The May 7 Ruling granted Plaintiff leave to file an amended complaint because of the

circumstances described in footnote 6, which noted "a gap in the Complaint's factual account, between McCain's first telephoned 911 call to the police which did not identify a suspect, and police officers' subsequent boarding of the school bus, searching for E. by name." *Id.* at *10, n.6. "The question arises," the footnote continued, "whether Plaintiff is in a position to allege additional facts in an amended complaint which would state a viable § 1983 claim against a CREC Defendant." *Id.*

Footnote 6 collected a number of cases which consider liability pursuant to § 1983 "when a defendant is a private actor and not an arresting officer." *Id.* Based on those cases, a plaintiff must show that the private defendant "instigated the arrest" by, for example, "importuning the authorities to act" with the intention that the plaintiff be confined. *Id.* By contrast, where "private actors merely furnished information leading to an arrest, liability does not attach." *Id.* Footnote 6 concluded by saying: "One cannot presently tell whether the Plaintiff at bar could, consistent with her obligations under Fed. R. Civ. P. 11, allege facts in an amended complaint sufficient to bring this case within the theory of those cases. The present complaint does not do so." *Id.*

Plaintiff took advantage of this opportunity to amend her pleading by filing an Amended Complaint [Doc. 53] whose allegations expand upon a number of areas, the most pertinent for present purposes being (1) pre-incident interactions between Plaintiff, her son E., and CREC or School administrators, and (2) communications between CREC Defendants and Hartford police officers on November 19, 2015, the date of E.'s arrest by the Hartford Police Department.

Plaintiff argues that the allegations of the Amended Complaint cure the deficiencies the Court identified in the May 7 Ruling, and plead viable claims against the CREC Defendants as state actors in respect of E.'s arrest.

The CREC Defendants respond that the Amended Complaint is just as deficient in that regard

as the original complaint. These Defendants move under Rule 12(b)(6) [Doc. 65] to dismiss the Amended Complaint for failure to state a claim against them. The Hartford Defendants continue to play no part in the CREC Defendants' motion to dismiss.

CREC's renewed motion to dismiss has been fully briefed again. This Ruling resolves the motion.

## THE AMENDED COMPLAINT

I begin with the account Plaintiff gives in her Amended Complaint (hereinafter "A.C.") of the manner in which E. came to be arrested by the Hartford police.

The Amended Complaint alleges that during the evening of November 18, 2015, there was delivered to the official email address of Defendant McCain, the School Principal, "a spoofed email address from Italy with the subject line 'reckoning.'" A.C. ¶ 59. That paragraph further alleges that "e-mail spoofing is the forgery of an e-mail header so that the message appears to have originated from someone or somewhere other than the actual source." *Id.*, ¶ 59 n. 1.

The email was not signed. *Id.* ¶ 61. The body of the email read:

> im fed up with the mind numbing shit thsis [*sic*] school puts me
> through
> its hell
> tomorrow im bringing my dads sawed off shotgun and pistol and
> ending this shit
> good night
> better make sure you get this before morning

*Id.* ¶ 60. McCain checked his office email and read this message at about 6:00 a.m. on the morning of November 19th. *Id.* ¶ 62.

The Amended Complaint further alleges that "at 6:15 a.m. on November 19" McCain forwarded the email to the CREC email addresses of Defendant Nolan, the CREC Director of

4

Security, and Defendant Sullivan, the CREC Assistant Superintendent for Operations. *Id.* ¶ 63.

"Between 6:00 a.m. and 6:20 a.m.," McCain called Sullivan to discuss the email. *Id.* ¶ 65. They

concluded that the email expressed a "legitimate threat." *Id.* ¶ 65. "McCain called 911 at 6:21 a.m.

and informed the HPD 911 dispatcher of the email and that McCain believed the threat it contained

was credible." *Id.* ¶ 72. This was the CREC Defendants' initial notification to the Hartford Police

Department ("HPD") about the incident. "Defendants McCain, Sullivan and Nolan were in

continuous communication with HPD from approximately 6:20 a.m. onward." *Id.* ¶ 73. The

succeeding paragraphs of the Amended Complaint recount aspects of that communication.

During McCain's initial 911 call at 6:21 a.m., he did not tell police whom he suspected had

sent the email. *Id.* ¶ 72. "Before 7 a.m. on November 19," McCain, Nolan and Sullivan

"determined E. was a suspect in the sending of the 'reckoning' email," as the result of certain

circumstances which in the perception of these CREC employees meant that E.'s "authorship of the

'reckoning' email was likely." *Id.* ¶ 92.[1] E., who traveled from his home to Two Rivers by school

bus with other students, boarded the bus at about 6:57 a.m. *Id.* ¶ 110. By this time, it appears that

the CREC Defendants had identified E. to the HPD as the suspected author of the email, but they

made no effort to prevent E. from boarding the bus at that time. *Id.* ¶ 111.

"McCain, Sullivan and Nolan told the Hartford Police Department that E. would be on the

bus," *id.* ¶ 115, and subsequently "directed the bus to the Greater Hartford Academy of the Arts,

another school about a block away from the HPD, instead of having the bus go to Two Rivers," *id.*

¶ 117. The bus "arrived at school around 7:22 a.m." *Id.* ¶ 116. The Amended Complaint alleges

---

[1] Throughout the Amended Complaint and the submissions on this motion, Defendants refer to the email in question as the "reckoning email." The adjective is derived from the subject line on the email itself. I adopt that reference in this Ruling.

that the CREC Defendants "knew and understood" that HPD officers "would meet the school bus at the other school with the intention of removing E. from the school bus and detaining him and interrogating him about the 'reckoning' email," *id.* ¶ 119, and further that they "knew and intended" that police officers "would detain and arrest E. in order to prevent E. from carrying out the alleged violent threat contained in the 'reckoning' email," *id.* ¶ 120.

HPD officers met the school bus and removed E. from the bus. *Id.* ¶¶ 134, 135, 137. At that time, at least one officer had his gun drawn and pointed at E. *Id.* ¶ 138. They asked E. whether he had sent the email, which he denied, and then searched E., and discovered that he had no weapons or contraband on his person or in his bag. *Id.* ¶¶ 143, 151, 153. The officers then handcuffed E. and transported him in a police cruiser to the Two Rivers school building. *Id.* ¶¶ 151, 154, 170. At the Two Rivers school building, two Hartford police defendants interrogated E. *Id.* ¶ 176. They were later joined by McCain, who asked questions about the 'reckoning' email. *Id.* ¶¶ 188-190. E. was released shortly after his parents arrived at the school, *id.* ¶ 215, approximately 55 minutes after his arrest, *id.* ¶ 215. E. was never charged with sending the email, and no further action was taken against him. *Id.* ¶ 220.

The Amended Complaint also contains allegations which undertake to explain why the CREC Defendants believed that E. was the probable author of the "reckoning" email. It is alleged that Plaintiff Thais Ortolaza and her son E. "had been at Two Rivers on the evening of November 18, 2015 for a parent-teacher conference to discuss E. and his academic progress." *Id.* ¶ 48. According to McCain, *see infra*, E. had previously discussed with McCain his familiarity with firearms and association with local gangs. The Amended Complaint states that at the November 18 conference, Plaintiff was unhappy about a lack of communication between the School and herself

about the disciplining of E., *id.* ¶ 54, and "after the parent-teacher conference," E. was perceived to be angry "because his mother publicly humiliated him," *id.* ¶ 58. Plaintiff and E. left the School and presumably returned to their home. The unsigned threatening email was delivered to McCain's office at approximately 10:13 p.m. that evening. *Id.* ¶ 59. When McCain, Nolan and Sullivan discussed the email before 7 a.m. on the following morning of November 19, they

> determined E. was a suspect in the sending of the "reckoning" email because (A) of E's alleged prior statements about weapons to Defendant McCain, (B) E. allegedly felt angry after the parent teacher conference the night before and (C) E. was the only student smart enough to know what the word "reckoning" meant and thus his authorship of the "reckoning" email was likely.

*Id.* ¶ 92. "By identifying E. to the Hartford Police Department, Defendants McCain, Sullivan and Nolan intended that E. be arrested and detained." *Id.* ¶ 95.

By the end of 2017, the parties had, in the vernacular, "lawyered up." Plaintiff filed her initial complaint against the CREC Defendants and the Hartford Defendants on November 9, 2017. By this time, E. had withdrawn from Two Rivers School (which he never returned to after the November 19, 2015 incident, *id.* ¶ 223).

In addition to the allegations contained in the paragraphs quoted or cited *supra*, the Amended Complaint also refers to a letter dated December 18, *2017* (over two years after the incident in suit), which McCain's counsel sent to Plaintiff's attorney of record "regarding the incidents at issue in this litigation." *Id.* ¶ 36. The Amended Complaint includes several assertions which Plaintiff's attorney claims that counsel for McCain made in that letter. Specifically, the Amended Complaint alleges the December 18 letter contained the following statements by McCain's counsel:

- McCain had met with E. about four times for disciplinary issues, where "E. would freely and openly discuss firearms and his affiliation with local gangs." *Id.* ¶ 36. McCain recalled this information because E. was "the only student to discuss openly

his possession and knowledge of firearms as well as his affiliation with known gangs." *Id.* ¶ 37. McCain could not determine "if this was simply a new student trying to 'impress' others or if in fact E's statements were true." *Id.* ¶ 38.

- "The identification of E. was made through Hartford Police questioning of Mr. McCain." *Id.* ¶ 82. Specifically, "[t]he police pressed Mr. McCain to name anyone who may have access to firearms, Mr. McCain named E." *Id.* ¶ 83.

- "[T]he Police persisted in asking Mr. McCain to identify any student whom he thought could have access to firearms." *Id.* ¶ 84. As a result of the alleged prior statements by E. about his access to firearms, "McCain identified E. as a student who may have access to firearms." *Id.* ¶ 85.

- McCain, Nolan and Sullivan opined that "E. wrote the threatening email directly following the school meeting out of anger over what transpired at the meeting, only hours prior to the subject email was sent" [*sic*]. *Id.* ¶ 86.

Somewhat surprisingly, given the quotations from counsel's letter in the preceding paragraphs of the Amended Complaint, the A.C.'s final reference to that letter reads as follows:

> The December 18, 2017 letter unequivocally stated "*At no time did Mr. McCain or any CREC employee identify E. as the student who wrote the threatening email.*" (emphasis in original).

*Id.* ¶ 87. The emphasized disclaimer seems somewhat at odds with other explicit or implicit assertions in the December 18, 2017 letter from McCain's attorney, to the effect that McCain identified E. to the Hartford police as the likely author of the email.

Moreover, the Amended Complaint quotes a police report about the incident, dated November 19, 2015, the day of the arrest, signed by Detective Trigila, one of the Hartford Defendants, which recites:

> McCain informed CREC Director of Security Chris Nolan that he believed the threat was made by student [E.], who has been having disciplinary issues in the school recently and may have had a motive to make the threat.

*Id.* ¶ 88. This police report does not state explicitly that McCain informed the HPD (as well as

Nolan) of his belief that E. was the perpetrator. However, it is plausible to conclude that McCain did so. The police, responding to communications by the School administrators, went directly to the school bus, singled out only E. for preliminary questioning, handcuffed E., and removed him from the scene in a police vehicle.

It is not clear what effect, if any, this reviewing Court should give to the quotations Plaintiff selects from a letter written by Defendant McCain's attorney two years after the incident in suit. The question presented by this action, brought under the aegis of § 1983, is whether Plaintiff's Amended Complaint alleges a viable claim that a CREC Defendant violated the United States Constitution as a *state actor*. To achieve that purpose, the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While I must assume the veracity of "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, "that presumption of truth does not extend to legal conclusions," *id*. at 678. The letter of an adverse party's attorney, an exercise in advocacy two years after the event, is an unlikely place to look for well-pleaded factual allegations in support of a claim the author-attorney and his client McCain oppose. On the other hand, I accept that McCain's attorney wrote the December 18, 2017 letter and the Amended Complaint quotes it accurately. Trial counsel is authorized to speak for and bind his client in litigation. In evaluating Plaintiff's § 1983 claim against McCain, a party, I will regard the letter of McCain's counsel as reciting admissible statements by McCain, *see* Fed. R. Evid. 801(d)(2),[2] and

---

[2] Rule 801 collects exclusions from the hearsay rule. Statements of a party falling under Rule 801(d)(2) were at one time referred to as "admissions" in the title to the subdivision, but the 2011 Amendments deleted that descriptive noun, for reasons stated by the Advisory Committee: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense – a statement can be within the exclusion even if it

give those statements such effect upon the relevant issues as the circumstances require.[3]

## DISCUSSION

I must now determine whether Plaintiff's proposed Amended Complaint "states a plausible claim for relief" against any CREC Defendant in an action where the Court's subject matter jurisdiction depends upon Plaintiff's invocation of 42 U.S.C. § 1983. That is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted). Under governing law, Plaintiff's claim turns upon whether her Amended Complaint alleges facts sufficient to show that the CREC Defendants should be regarded as "state actors" with respect to the specific claims for relief asserted this Plaintiff in her pleading.

Plaintiff contends that the CREC Defendants were state actors. Obedient to higher authority, I must draw on common sense in comprehending Plaintiff's basis for that contention. The prolix allegations of the Amended Complaint are less than a model of clarity in explaining what these School administrators did in the events leading up to E's arrest by the Hartford police. However, armed by such judicial experience and common sense as I have, it seems to me that the core of what happened in this case, derived from the well-pleaded factual allegations in the Amended Complaint, is this:

The anonymous "reckoning" email McCain read at his office at 6:00 a.m. on November 19. 2015, clearly threatened deadly violence at the Two Rivers School. Given the tragic shootings at

_____

'admitted' nothing and was not against the party's interest when made."

[3]  The same attorneys appear for all the CREC Defendants. It is arguable, therefore, that the contents of counsel's December 18, 2017 letter constitute admissions binding upon all these Defendants. I need not resolve that issue in order to decide the present motion.

schools in recent years, the prompt action of McCain and his CREC colleagues in notifying the Hartford police about the threat was an exercise in common sense. The police's common-sense response was to ask the school administrators who they thought the author of the threat might be. The police had no way of knowing or determining that identity with the expediency necessary for such a threat, but the author identified himself as a student. Common sense suggested to the police that McCain, the School principal, might know or suspect who the author could be. In point of fact, McCain, after discussing the question with his CREC colleagues, told the police that E. was familiar with firearms, would be on the bus heading for the School, and was suspected of having written the email. The HPD acted upon that information by removing E. from the bus and briefly detaining and questioning him, before releasing him without taking further action.

The conduct of McCain and the other CREC Defendants would cast them in the role of "state actors" in E's arrest if they were acting "under color of" state law, as that phrase is used in (and required by) § 1983. Whether that showing is made by the expanded factual account set forth in the Amended Complaint requires a further consideration of case law.

## I

One must perforce begin with the Supreme Court's decision in *Adickes v. S.H. Kress and Co.*, 398 U.S. 144 (1970), apparently the initial consideration by the Court of a private party's constitutional liability for an arrest executed by police. The incident in suit took place in Hattiesburg, Mississippi in August 1964. *Id.* at 146. Kress, the defendant store and a private party, refused to serve lunch at its Hattiesburg restaurant facilities to plaintiff Sandra Adickes, a white school teacher from New York who was accompanied by six African-American local summer school students (who were offered service). *Id.* at 146-47. Upon Adickes's departure from the store, she

was arrested by the Hattiesburg police on a charge of vagrancy. *Id.* at 146. Adickes filed a two-count complaint against Kress under § 1983 alleging "discrimination based on race in violation of petitioner's equal protection rights." *Id.* at 150 (footnote omitted). Adickes's second count alleged that "both the refusal of service and her subsequent arrest were the product of a conspiracy between Kress and the Hattiesburg police." *Id.* at 147. The district court dismissed this count on summary judgment, and the Second Circuit affirmed. *Id.* at 148. The Supreme Court reversed and remanded the case for trial. *Id.*

The Court's opinion in *Adickes* undertakes to instruct the lower courts on the nature and limitations of a § 1983 civil rights action against a private party in the context of a police arrest. It is profitable to quote Justice Harlan's opinion at some length:

> Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way act to compel or encourage racial segregation. Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, *or to cause her subsequent arrest* because she was a white person in the company of Negroes.

*Id.* at 151-53 (emphasis added) (footnotes omitted). The Court further explains:

> The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful. Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for the purposes of the statute. To act 'under color' of law does not require that the accused be an officer of

> the State.  It is enough that he is a willful participant in joint activity
> with the State or its agents."  *United States v. Price*, 383 U.S. 787,
> 794 (1966).

*Id*. at 153 (footnotes and some citations omitted).

The concluding paragraphs of the *Adickes* opinion reprises the Court's holding and reasoning:

> In summary, if the petitioner can show (1) the existence of a state-
> enforced custom of segregating the races in public eating places in
> Hattiesburg at the time of the incident in question; and (2) that Kress'
> refusal to serve her was motivated by that state-enforced custom, she
> will have made out a claim under § 1983."

*Id*. at 174-75.  At this point in the text, the Court drops footnote 44, which repeats the holding  in *Price*, 383 U.S. at 794 ("To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State"), and  goes on to say:

> Because the core of congressional concern in enacting §1983  was to
> provide a remedy for violations of the Equal Protection Clause
> arising from racial discrimination, we think that a private person who
> discriminates on the basis of race and with the knowledge of and
> pursuant to a state-enforced custom requiring such discrimination, is
> a "participant in joint activity with the State," and is acting "under
> color of" that custom for purposes of § 1983.

398 U.S. at 174, n.44.  Elsewhere in its text and footnotes, the *Adickes* opinion emphasizes the central importance of a private party acting  "under color of" state law in order to be characterized as a "state actor" and subject to § 1983 liability.  The Court observed that "the legislative history of § 1 of the 1871 Act,[4]  the lineal ancestor of § 1983, also indicates that the provision in question ['under color of law'] was intended to encompass only conduct supported by state action."  *Id.* at

---

[4]  The Ku Klux Act of April 20, 1871, 17 Sta. 13.

164.  The Court's discussion in *Adickes* indicates that a strict limitation upon a private party's liability for violating the 1871 Act was a matter of legislative debate and compromise.  "For example, § 2 of the 1871 Act, a provision aimed at private conspiracies with no 'under color of law' requirement, created a great storm of controversy, in part because it was thought to encompass private conduct."  *Id.* at 166.  "The comparative lack of controversy concerning § 1, in the context of the heated debate over the other provisions, suggests that the opponents of the Act, with minor exceptions, like its proponents understood § 1 to be limited to conduct under color of law."  *Id.* at 167.  "In addition to the legislative history," the Court continued, "there exists an unbroken line of decisions, extending back many years, in which this Court has declared that action 'under color of law' is a predicate for a cause of action under § 1983[.]"  *Id.* at 166.

The effect of these considerations is to create a relatively high bar for an advocate seeking to demonstrate that a private party's conduct is that of a state actor, with its attendant constitutional liabilities.  Thirty-one years after the Court decided *Adickes*, it said of § 1983 actions: "state action may be found if, *though only if*, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation and internal quotation marks omitted) (emphasis added).  A plaintiff "pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action."  *Tancred v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).

While the *Adickes* opinion describes circumstances in which a private party may share with arresting police officers § 1983 liability for an unlawful arrest, *Adickes* nowhere supports the proposition that in the case at bar, the CREC school administrators were deliberately engaged in

joint activity with the Hartford police for a constitutionally prohibited purpose, of the sort that required a trial in *Adickes*. I noted in the May 7 Ruling: "The complaint in this case contains no allegation or suggestion that McCain, Sullivan or Nolan, the CREC employees, knowingly supplied false information to the Hartford police, or knew that E. was in fact innocent at the time of the CREC Defendants' communications with the Hartford police," 2018 WL 2100280, at *9, or that the CREC Defendants "intended to involve the police in a joint effort to prosecute the innocent," *id.* at *10. The additional allegations in the Amended Complaint do nothing to change those circumstances.

*Adickes*, a seminal decision, has by Westlaw's current count been cited by 31,534 subsequent Supreme Court and lower court cases.[5] The caselaw describes the criteria for determining when a private party was a state actor or acted under color of state law. The Second Circuit noted in *Sybalski v. Indep. Grp. Home Living Program*, 546 F.3d 255 (2d Cir. 2008), that as decided by the cases, "the actions of a nominally private entity are attributable to the state" when the circumstances satisfy one of several tests: (1) the private entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the private entity, the entity is a "willful participant in joint activity with the state," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the private entity "has been delegated a public function by the state" ("the public function test"). 546 F.3d at 257 (citing and quoting *Brentwood*, 531 U.S. at 296).

---

[5] As of May 22, 2019. *See Adickes v. S.H. Kress and Co.*, WESTLAW, http://westlaw.com (search for case and view citing references tab)

## II

A considerable number of § 1983 civil rights cases, like the one at bar, involve claims by individuals who were arrested as the result of communications between private parties and the police. The frequency of such cases is not surprising. A police arrest on the basis of a private citizen's complaint or information is a commonplace occurrence. An arrestee claiming violation of his or her rights is interested in suing everyone potentially liable. Liability of a particular defendant in such a case depends initially upon whether that defendant is a state actor. The police provide no ground for litigation of that threshold question; police officers executing an arrest are by definition acting under color of state law. Whether a private individual's involvement in the arrest constitutes action under color of law sufficient to make that individual a state actor depends upon particular circumstances which the Supreme Court in *Brentwood Academy* and the Second Circuit in *Sybalski* undertook to identify by means of articulated "tests." The concept of a private entity as a state actor for § 1983 purposes is a fertile ground for litigation. No cases are entirely alike. Some are more instructive than others.

A notable contrast to the case at bar is found in *Mara v. MacNamara,* No. 3:14-CV-1095, 2015 WL 4392956 (D. Conn. July 15, 2015), decided by Judge Chatigny of this Court on a motion to dismiss. The plaintiff, a student at a university, filed a § 1983 action for false arrest against university employees and local police officers involved in plaintiff's arrest for an assault against another student, which was subsequently shown to have been committed by someone other than plaintiff. *Id.* at *5. While *Mara* bears some surface resemblance to the case at bar, the circumstances relevant to the respective plaintiffs' § 1983 claims are quite different, as Judge Chatigny's meticulous decision demonstrates.

The plaintiff in *Mara,* a Fairfield University student, attended an off-campus party where another student was hit on the head with a bottle.  *Id.* at *1.  The victim could not say who assaulted him.  *Id.*  Police officers  from the Town of Fairfield investigated the incident.  *Id.*

A time came when Town police asked the University Public Safety Department for a photograph of the plaintiff.  *Id.*  The University complied; an unknown University official provided the town with plaintiff's photograph.  *Id.*  The police included plaintiff's photograph in an array which was showed to a witness at the party.  *Id.*  The police then sought to interview plaintiff, and arranged with plaintiff's attorney to meet with plaintiff at police headquarters the next day.  *Id.*

Town police made contact with Defendant Cleary, a Fairfield University campus security officer.  *Id.*  The complaint, as paraphrased by Judge Chatigny's opinion, recounted these additional events:

> Town police officers drove to the University campus.  With the assistance of Officer Cleary, they located the plaintiff.  He was "detained," placed in a University vehicle driven by Cleary, and brought to the University Public Safety Office.  Cleary gave the officers audio and video equipment to record the interrogation and permitted them to use the office but did not participate in the interrogation himself.

*Id.*

The gravamen of plaintiff's complaint was that Cleary, a University security officer, actively participated in the arrest of plaintiff.  Judge Chatigny says in his opinion:

> According to the complaint, the police wanted to arrest the plaintiff and Cleary undertook to help them.  The officers benefitted from Cleary's participation because he helped locate the plaintiff and transported the plaintiff to the campus security office . . . . [T]he complaint does allege that the officers lacked even probable cause, that they asked Cleary to help make the arrest, and that he did so.

*Id.* at *4-*5.  On the motion to dismiss before him, Judge Chatigny construed the complaint's

allegations to justify this holding by the Court: "That Cleary actually participated in the arrest then took the plaintiff to the Public Safety Office for interrogation renders him a state actor with regard to the false arrest claim." *Id.* at *4. In Judge Chatigny's view, the account plaintiff pleaded in his complaint was that "Cleary participated alongside Town officers in making an arrest and was therefore directly involved in the alleged constitutional violation." *Id.*[6]

With respect to the involvement of private individuals in the arrests in these two cases (Cleary in *Mara*, McCain and the other CREC school administrators in the case at bar), there are significant differences. Cleary was employed as a security officer by the Fairfield University Department of Public Safety, which "is authorized by Fairfield University to prevent, investigate and report any violations of State or Federal Law and/or University regulations."[7] In dealing with students on the Fairfield campus, Cleary had police-like powers which, at the request of Town police, he exercised on this occasion: identifying, stopping, and detaining plaintiff, and transporting plaintiff in a University vehicle driven by Cleary to the University Public Safety Office, where Town police interrogated plaintiff. Those circumstances underlie Judge Chatigny's remark in *Mara* that "Cleary participated alongside Town officers making an arrest." The case at bar differs in that the

---

[6] The opinion in *Mara* indicates that during consideration of the motion to dismiss, the University defendants sought to deny that plaintiff had been arrested. 2015 WL 4392956, at *4, n.4. Judge Chatigny held at footnote 4 that the defendants were bound by a prior concession to the contrary, namely, that "probable cause" existed "for purposes of the alleged actions by the FPD," probable cause being required (as Judge Chatigny observed) "only if the stop qualifies as an arrest." *Id.* Thus there was uniform recognition that when Cleary identified and singled out plaintiff on campus, stopped him, placed him in a University vehicle and drove him to a University office for interrogation by the police, Cleary was participating side-by-side in an arrest of the plaintiff. Indeed, if anyone were onlookers, it was the police officers.

[7] FAIRFIELD UNIVERSITY DEPARTMENT OF PUBLIC SAFETY,
https://www.fairfield.edu/undergraduate/student-life-and-services/public-safety/ (last visited May 22, 2019).

Hartford police, acting on information provided by McCain and his CREC colleagues, acted alone when they boarded the school bus, got E. to identify himself, arrested him, handcuffed him, and transported E. in a police vehicle to the School. No CREC defendant was "participating alongside" Hartford police officers during those pertinent events.

### III

The May 7 Ruling discussed a number of arrest cases which considered a private entity's possible § 1983 liability as a state actor, acting under color of state law. I continue to rely on them, particularly *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999). *See* 2018 WL 2100280, at *7 (discussing cases). Guidance may also be derived from the Second Circuit's opinion in *King v. Crossland Savings Bank*, 111 F.3d 251 (2d Cir. 1997), a case involving claims asserted under state law, rather than § 1983. Plaintiffs in *King*, a bank customer and his companion, sued a bank and the issuer of travelers' checks for false imprisonment. *Id.* at 253. Plaintiffs alleged that their arrests were caused by the bank's erroneous report to police that third-party travelers' checks presented to the bank by the plaintiff customer were either lost or stolen, a report based on information provided by the issuer. *Id.* The Second Circuit's opinion affirming the district court's grant of summary judgment for defendants includes this reasoning:

> To hold a defendant liable as one who affirmatively instigated or procured an arrest, a plaintiff must show that the defendant or its employees did more than merely provide information to the police. *The mere identification of a potential culprit does not give rise to liability.* It is the law of this state that the mere furnishing of information to the police will not subject the informant to liability in an action for false arrest when an arrest of an innocent person results from such information. Further, if a defendant erroneously reports a suspected crime, but in no other way instigates the arrest, he is not liable for false imprisonment.

19

*Id.* at 257 (citations and internal quotation marks omitted) (emphasis added).[8]  Based on that reasoning, the Second Circuit concluded that since plaintiffs provided no evidence that the defendant bank "did more than identify the holders of reportedly stolen travelers' checks to officers of the NYPD, we affirm the finding of the district court that Crossland did not direct the agents of the NYPD to arrest [plaintiffs] and therefore cannot be held liable on a claim for false imprisonment." *Id.*

The Second Circuit's analysis in *King* is applicable to a federal constitutional claim for false arrest asserted under § 1983. In *Camac v. Long Beach City Sch. Dist.*, No. 09-CV-5309, 2011 WL 3030345, at *8 (E.D.N.Y. July 22, 2011), a § 1983 claim against school administrators for instigating the arrest of a child in their care, the district court cited *King* for the proposition that "[i]n the context of false arrest, liability will not attach to a defendant who merely seeks police assistance or furnishes information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made."

Second Circuit decisions, in keeping with those of the Supreme Court in *Adickes* and *Price*, require a greater degree of joint activity between police and private entities than that presented by this case to justify regarding a private individual as acting under color of state law and consequently liable for false arrest under § 1983.  Thus in *Alexanian v. New York State Urban Dev. Corp.*, 554 F.2d 15, 16-17 (2d Cir. 1977), the plaintiff, a pedestrian, was struck by a Cadillac driven by "John Doe," a private driver.  Plaintiff alleged in his § 1983 complaint that he called a city policeman to the scene, with the unexpected result that "the policeman, acting in collaboration with John Doe,

---

[8]  *King* summarizes New York law on the point.  There is no reason to think that Connecticut law is any different.

caused plaintiff to be arrested and taken to the police station, where he was threatened that, unless he withdrew his charges against the driver, charges would be pressed against him for jumping on the hood of the Cadillac." *Id.* at 17. The Second Circuit held that these allegations stated a claim "against the policeman as a person acting under color of state law for deprivation of freedom without due process in violation of § 1983," and *also* "against the driver collaborating with the officer acting under color of state law," citing on that point *Adickes* and *Price*. *Id.*

*Alexanian* was cited and followed in *Bacquie v. City of New York*, No. 99-CIV-10951, 2000 WL 1051904, at *1 (S.D.N.Y. July 31, 2000), where the plaintiffs were arrested by city police for trespass on a hotel's premises based on a complaint lodged by hotel employees. Plaintiffs sued the police officers and the hotel employees under § 1983 for false arrest. *Id.* The hotel employees moved to dismiss for plaintiff's failure to allege state action as to them. *Id.* The district court noted that "[a] private individual may be subject to § 1983 liability if that individual willfully collaborated with an official state actor in the deprivation of a federal right." *Id.* (citing *Adickes*, 398 U.S. at 153 and *Alexanian,* 554 F.2d at 17). Plaintiffs alleged that "the police officers and the hotel security officers conspired together to deprive them of constitutional rights." *Id.* "The question," Judge Martin said, "is whether the plaintiffs' allegation of a conspiracy between the hotel defendants and the police goes beyond conclusory allegations and naked assertions." *Id*. The hotel defendants relied on *Newman v. Bloomingdale's*, 543 F. Supp. 1029 (S.D.N.Y. 1982), which held that "when a private citizen calls the police for assistance and makes a complaint against an alleged lawbreaker that citizen does not automatically become a state actor for § 1983 purposes." 2000 WL 1051904, at *2. The district court rejected that defense in *Bacquie*, where the plaintiffs had an earlier dispute with hotel security officers, left the hotel, returned to it, and were again stopped by a security officer.

This then transpired:

> A short time later police officers arrived and consulted privately with the hotel security officers. The police officers then approached the plaintiffs and threatened to arrest them unless they signed a "Trespass Report" form provided by the hotel. According to the form, the signor acknowledges that the hotel has revoked his or her invitation to the public areas of the hotel and has warned the signor that returning to the hotel will result in prosecution for Criminal Trespass in the Third Degree. When the plaintiffs refused to sign, the police officers arrested them.

*Id.* at *1. Those circumstances, the district court held, took the case out of the general principle articulated in *Bloomingdale's.* Judge Martin reasoned:

> In the instant case, however, the hotel defendants allegedly did more than just call the police and swear out a complaint. The police officers consulted with the hotel employees and then ordered the plaintiffs to sign the hotel's "Trespass Report" form under threat of arrest. The hotel's complaint against the plaintiffs was that they were trespassing, i.e., that they did not leave the public areas of the hotel when told to do so. If the officers had asked the plaintiffs to leave the hotel under threat of arrest or simply arrested the plaintiffs immediately, the situation would be exactly analogous to *Bloomingdale's.* The fact that the police officers consulted with the hotel employees and then tried to get the plaintiffs to sign a hotel form whereby they agreed never to enter the hotel again gives rise to an inference that the officers and hotel security were acting in concert. On a motion to dismiss, this is a sufficient allegation that the hotel employees acted under color state law. *See Alexanian*, 554 F.2d at 17.

*Id.* at *2.

In *Camac* the district court, having cited and quoted *King* for the proposition that a plaintiff must show a defendant "did more than merely provide information to the police" in order to impose liability on that defendant "as one who affirmatively instigated or procured an arrest," went on to say:

> However, a defendant is liable for false arrest if, with the intent to have the plaintiff arrested, he makes false statements to the police and instigates the arrest. Importantly, even where there is no claim that a defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can show that defendants instigated his arrest, thereby making the police agents in accomplishing their intent to confine the plaintiff.

2011 WL 3030345, at *8 (citations and internal quotation marks omitted). The district judge, denying a defense motion to dismiss, held that the complaint sufficiently pleaded a § 1983 claim against school administrators who allegedly "intentionally contacted the police and provided false information that would cause the police to confine" a student at the school, and "intentionally provided false testimony at the [mental health law] Hearing, and that such false testimony was the basis for the ruling that [the student] remain confined" at a hospital. *Id.*

To similar effect are *Bang v. Utopia Restaurant*, 923 F. Supp. 46 (S.D.N.Y. 1996), and *Forbes v. City of York*, No. 05-Civ-7331, 2008 WL 3539936 (S.D.N.Y. Aug. 12, 2008). In *Bang*, plaintiffs' § 1983 complaint alleged that they were customers in a restaurant; they had an altercation with the owners; and that an owner, Tsopelas, then phoned the police. Two officers came to the restaurant, the officers "engaged Tsopelas in a conversation lasting 20 minutes," and then arrested plaintiffs without cause to do so. *Id.* at 49. Tsopelas and a co-defendant, a restaurant co-owner, contended in a motion to dismiss that the complaint "fails to state § 1983 claims against them because there is no allegation that either defendant acted jointly with the police." *Id.* The district court denied that motion and let the case proceed, stating:

> To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.
>
> Plaintiffs allege in the Amended Complaint (1) that Tsopelas

23

called the police, (2) that 30 minutes later, two police officers arrived and engaged Tsopelas in a 20-minute conversation, and (3) that Officer Dean arrested Laura Bang after the conversation ended abruptly. Calling the police, alone, does not establish joint action with the police and the private caller. However, drawing all reasonable inferences in plaintiffs' favor, joint action between Tsopelas and the officers could be inferred here from the 20-minute conversation and the timing of the arrests.

Plaintiffs expressly allege that Tsopelas caused the false arrests of plaintiffs for the purpose of interfering with their exercise of civil rights. Plaintiffs could establish that the officers shared that unlawful goal if they could demonstrate that the officers knew that the arrests for trespass and disorderly conduct were unjustified . . . . [T]he officers waited 20 minutes before arresting Laura Bang. If there were facts establishing probable cause to arrest plaintiffs for criminal trespass when the officer arrived at Utopia, it should not have taken 20 minutes for the restaurant owners to explain those facts to the officers . . . . [D]rawing all reasonable inferences from the facts alleged therein in favor of plaintiffs, the joint action allegations clear the low hurdle of Rule 12(b)(6).

*Id*. at 49-50 (citation omitted).

In *Forbes*, plaintiffs were attending a concert on the grounds of Lincoln Center in New York City. They were arrested by City police, summoned to the scene by Lincoln Center security officers who had unsuccessfully tried to make plaintiffs cease loud criticisms of the City for denying access to the Great Lawn in Central Park to Iraq War protesters. 2008 WL 3539936, at *8. In their ensuing § 1983 action for false arrest, plaintiffs sought to impose liability upon the Lincoln Center employees, private actors, on the basis of a theory that "a conspiracy between Lincoln Center and the police existed to chill speech in support of greater access to the Great Lawn in Central Park." *Id.* The district court held that this theory of private actor liability survived a motion to dismiss:

Not infrequently, courts find joint action where, pursuant to a *prearranged custom, practice, or policy,* the police rely disproportionately on an otherwise private actor's "say-so" to make an arrest. Such a policy is different from a situation in which a

24

private actor merely reports criminal activity to police officers, who act accordingly. *See Ginsberg*, 189 F.3d at 272.

In this case, plaintiffs allege that, based on an agreement between the City and Lincoln Center to chill speech urging greater access to the Great Lawn, the police would arrest those who advocated greater access to the Great Lawn and were identified by the Lincoln Center Defendants. While we are skeptical that plaintiffs will ultimately be able to prove this conspiracy, we conclude that they have made sufficient allegations to survive the motion to dismiss.

*Id*. at *8-*9. No comparable agreement, plan or policy is alleged in the case at bar.

The cases discussed in the May 7 Ruling and those cited *supra* establish that the CREC Defendants cannot be held liable under § 1983 for E.'s arrest and detention. McCain, Nolan, and Sullivan were not state actors in those events because (unlike the Hartford Police) they were not acting under color of state law. As the May 7 Ruling held, Plaintiff's initial complaint did not contain factual allegations sufficient to demonstrate that required status. The somewhat expanded details in the proposed Amended Complaint fare no better.

The plain fact of the matter, as recounted in each pleading, is that McCain took the manifestly sensible step of telephoning the Hartford police and informing them about the threatening e-mail, thereafter responding to police inquiries by giving them information about E. Police then boarded the school bus, arrested E., and detained him for a time – based on their own exercise of judgment, and through no undue influence or coercion by the CREC Defendants. The cited cases hold uniformly that a private individual's calling the police and giving them information – even if the information is later shown to be incorrect – does not establish joint action between the police and the private caller for the purpose of § 1983 liability. Nor does such conduct, standing alone, constitute private "instigation" of an arrest carried out by police of a nature exposing the private individual to a § 1983 claim.

Courts are understandably disinclined to allow the assertion of constitutional civil rights claims against private citizens who send such communications to their local police. The circumstances present in the cases upholding § 1983 claims against private parties for arrests executed by police were not previously alleged by this Plaintiff in her initial complaint, and are not alleged in her Amended Complaint. The CREC Defendants did not knowingly convey to the Hartford police false information about E., with the intent of procuring the arrest of an innocent individual. The Hartford police's arrest of E. was not in furtherance of a pre-existing plan or policy between the CREC Defendants and the police to accomplish a purpose of problematic validity (the set of facts presented by *Adickes*). The police's decision to arrest E. was the result of communications from McCain that, as a matter of law, do not subject these school administrators to claims under § 1983.[9]

## IV

An additional aspect of the case requires discussion. The Amended Complaint contains a number of references to the Connecticut General Statutes. Specifically, the A.C. includes the following allegations:

---

[9]  In Count I of the Amended Complaint, charging McCain with false arrest under § 1983, Plaintiff alleges that McCain "called the police on E. without reasonable basis," A.C. ¶ 234; McCain "intended that Defendant Officers arrest E.," *id.* ¶ 235; that "as a result," the police officers "acted on behalf of Defendant McCain and Defendant CREC to remove him from the school bus at gunpoint and to further restrain E's liberty by handcuffing him and driving him to school and then handcuffing him again to a chair," *id.* ¶ 236; and "Defendant City of Hartford and its Defendant Officers operated under the control of Defendant CREC administrators, including Defendant McCain," *id.* ¶ 240. Conclusory and argumentative allegations such as these play no part in the Court's evaluation of the legal sufficiency of the pleading. The plausible interpretation of Plaintiff's factual allegations is that the Hartford police acted on their own for the public safety in deciding whether to arrest E., and did so on the basis of information conveyed by McCain, for which no § 1983 liability on the part of McCain can attach.

- CREC is a "regional education service center" created under Conn. Gen. Stat. § 10-66 *et seq.*, as well as "a public educational authority acting on behalf of the state of Connecticut," pursuant to Conn. Gen. Stat. § 10-66c.  A.C. ¶¶ 6, 7.

- Two Rivers is a public school.  The educators working at Two Rivers are under a statutory duty to provide "a safe school setting" pursuant to Conn. Gen. Stat. § 10-220(a)(4).  A.C. ¶ 9.

- McCain is "a mandated reporter who must report a child who is placed at imminent risk of serious harm" under Conn. Gen. Stat. §§ 17a-101(b)(9) and 17a-101a.  *Id.* ¶ 33.  A mandated reporter who fails to report imminent risks of serious harm is guilty of a misdemeanor under Conn. Gen. § 17a-101a(b).  A.C. ¶ 35.

- Conn. Gen. Stat. § 10-236b(6)(b) provides that "No school employee shall use a physical restraint on a student except as an emergency intervention to prevent immediate or imminent injury to the student or to others . . ."  A.C. ¶ 121.

- If a restraint of a child exceeds 15 minutes, a school administrator "shall determine whether continued physical restraint or seclusion" is necessary under Conn. Gen. Stat. § 10-236b(f).  A.C. ¶ 197.  Any student who is physically restrained "shall be continually monitored by a school employee" pursuant to  Conn. Gen. Stat. § 10-236b(m).  *Id.* ¶ 199.

In support of her proposed Amended Complaint, Plaintiff purports to find in these Connecticut statutes a basis for characterizing the CREC Defendants as state actors in the events for which she brings this action.  Consistent with that theory, the Complaint alleges that "Defendants McCain, Sullivan and Nolan used their positions as state actors, *under their duties to provide a safe school environment*, to cause the arrest, handcuffing and interrogation of E."  *Id.* ¶ 182 (emphasis added).  Plaintiff argues in her brief on the present motion that since McCain, Nolan, and Sullivan had statutory duties under Conn. Gen. Stat. § 10-224(a)(4) as CREC employees to provide "'a safe school setting,'" they "levy discipline under the authority vested in them by the State of Connecticut, and are therefore state actors."  Doc. 69 at 14, 17.

Plaintiff's reliance upon these Connecticut statutes as a premise for the CREC Defendants'

alleged status as state actors prompts a restatement of the law governing the requisites of a claim asserted, as is this one, pursuant to 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). Each of these two elements is regarded as "a jurisdictional requisite for a § 1983 action." *Id*. at 47. The viability of a claim asserted under the aegis of § 1983 depends upon whether a particular defendant is a state actor, or acted under color of state law.

These are related but separate concepts. "In order to state a claim under § 1983, a plaintiff must allege that he was injured by *either* a state actor *or* a private party acting under color of state law." *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (emphases added). *Ciambriello* illustrates the distinction between the two roles: "Labor unions such as CSEA generally are not state actors, and Ciambriello does not argue otherwise. Rather, Ciambriello argues that CSEA acted under color of state law by conspiring with the County." *Id*. (citation omitted).

Circuit Judge Lynch expanded upon these principles in *Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012), an instructive opinion. *Fabrikant* held, on defendants' motion for summary judgment, that under a state statutory scheme, inspectors from the Society for Prevention of Cruelty to Animals (SPCA) were state actors when they seized, detained, and performed surgery upon animals previously cared for by the plaintiff.[10] *Id*. I will quote Judge Lynch at some length:

---

[10] The first *Fabrikant* opinion in the Court of Appeals dismissed the complaint with leave to replead. That opinion, granting a motion to dismiss, stated: "Plaintiff's complaint contains no allegation that the SPCA was a state entity, or had *otherwise acted under color of state law through some relationship with, or authority vested by, the State.*" 232 F. App'x 17, 19 (2d Cir. 2007) (emphasis added). The second opinion (discussed here) held that plaintiff's allegations showed the SPCA inspectors were state actors, but granted those defendants summary judgment on plaintiff's federal claims on the basis of qualified immunity and presence

Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action. A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action. If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action "under color of state law" for § 1983 purposes.

State action requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for who the State is responsible, and that the party charged with the deprivation must be a person who may fairly be said to be a state actor. Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action. But a private entity does not become a state actor for purposes of § 1983 merely on the basis of the private entity's creation, funding, licensing or regulation by the government. Rather, there must be such a close nexus between the state and the challenged action that the state is *responsible* for the specific conduct of which the plaintiff complains.

Supreme Court cases on the subject of state action have not been a model of consistency, and we therefore have no single test to identify state actions and state actors. Rather, there are a host of factors that can bear on the fairness of an attribution of a challenged action to the State. Three main tests have emerged: (citing and quoting *Sybalski,* 546 F.3d 255). The fundamental question under each test is whether the private entity's challenged actions are "fairly attributable" to the state.

In analyzing whether a private entity acts under color of state law for purposes of § 1983, we begin by identifying *the specific conduct of which the plaintiff complains*, rather than the general characteristics of the entity.

691 F.3d at 206-07 (emphasis added) (citations and internal quotation marks omitted). Comparable

declarations appear in *Cranley v. National Life Insurance Co. of Vermont*, 318 F.3d 105 (2d Cir.

---

of probable cause for the search of plaintiff's home and her arrest.

2003), an opinion by Judge Kearse:

> [C]onduct by a private entity is not fairly attributable to the state merely because the private entity is a business subject to extensive state regulation or affected with the public interest.  Nor is a private entity a state actor where its conduct is not compelled by the state but is merely permitted by state law.  Action taken by private entities with the mere approval or acquiescence of the State is not state action.

*Id*. at 112 (citations and internal quotation marks omitted).

Two principles the Second Circuit articulated in *Fabrikant* and *Cranley* – first, a court analyzing whether a private entity acts under color of state law first must identify "the specific conduct of which the plaintiff complains rather than the general characteristics of the entity";  and second, a private entity does not become a state actor "merely on the basis of the private entity's creation, funding, licensing, or regulation by the government"  – underlie the Second Circuit's *Sybalski* opinion, 546 F.3d 255.  Plaintiffs in *Sybalski* were the parents of a son living at a group home for adults with mental disabilities operated by the corporate defendant.  *Id.* at 256.  Plaintiffs complained repeatedly "about the care, protection and services" received by their son at the group home.  *Id.* at 256-57.  Plaintiffs, alleging that defendants imposed "illegal and unlawful restrictions on plaintiffs' right to visit and communicate with their son," *id.* at 257, brought an action under § 1983 for federal constitutional violations.  Defendants argued that they were private entities or individuals not subject to § 1983.  Plaintiffs sought to portray them as state actors:

> [Platintiffs] contend that "the State, by statute and regulation, has assumed a duty to provide custody, care and habilitative services to its mentally retarded citizens," and "where the State chooses to delegate those responsibilities and a private entity assumes them, as here, neither the State nor the private entity may assert that the entity's acts and omissions do not occur under color of state law." [quoting plaintiffs' appellate brief].  In essence, they argue that the state has undertaken to care for its mentally disabled citizens by (1)

30

> acting jointly with defendants to care for the mentally disabled and
> (2) delegating the public function of caring for the mentally disabled
> to defendants.

*Id.* at 258. Plaintiffs' contention relied upon a state mental health statute that subjected licensed facilities to "regulation, licensing and oversight" by a state commissioner; established rights to receive visitors and have privacy; bring complaints to the facility director; and authorized family members to visit patients consistent with a patient's ability to receive visitors. *Id.* The statute further provided that these rights "may not be limited as a punishment or for the convenience of staff," and any limitations would be permitted "only upon written order of a physician" or "by the director or chief executive officer of the facility." *Id.*

The Second Circuit rejected plaintiffs' effort to characterize the private operators of the group home in *Sybalski* as state actors. The court of appeals began its analysis by saying:

> It is not enough, however, for a plaintiff to plead state involvement
> in *some activity* of the institution alleged to have inflicted injury upon
> a plaintiff; rather, the plaintiff must allege that the state was involved
> with the *activity that caused the injury* giving rise to the action. The
> question is not whether the decision to *establish* the private entity
> was state action, but rather whether the private entity's decision to
> *sanction* plaintiffs may be "fairly attributable" to the government.

*Id.* at 258 (citations and some internal quotation marks omitted). The Second Circuit agreed with the district court that "the complaint has not alleged facts sufficient to show that the restrictions on the Sybalskis' contact with their son were so governed by state regulation as to be properly attributed to the state," and explained its reasoning on that point:

> While the state has established substantial rights for patients in
> mental health facilities and procedures for protecting these rights,
> those actions, without more, do not amount to "significant
> encouragement," "willful participation," or state "entwining," in
> defendants' decision to restrict the Sylbaskis' access to their son
> (citing and quoting *Brentwood*, 531 U.S. at 296) . . . . While the State

31

of New York has established *procedures* governing the limitations that mental health facilities place on the ability of patients to receive visitors, the administrators of those facilities make the *decision* about whether such limitations should be imposed. Accordingly, based on the facts alleged in the complaint, the state's involvement in defendants' decision to restrict the Sylbaskis' access to their son is insufficient to render that decision "state action" under the joint action test.

*Id.* at 258-59.

The Second Circuit's opinions in *Sybalski* and *Fabrikant* foreclose Plaintiff's contention that because a state statute imposed upon CREC school administrators a generally stated duty to provide "a safe school setting" to students, those administrators must be regarded as state actors in the case at bar. Within the particular context of a § 1983 claim, *Fabrikant* instructs district courts to decide whether a private entity acted under color of state law by focusing upon "the specific conduct of which the plaintiff complains" (the arrest of E.), rather than "the general characteristics" of the CREC entity (defined in part by the state statutes Plaintiff relies upon). *Sybalski* applies that principle. The specific conduct of which the plaintiff parents complained was defendants' restriction of access in the group home to plaintiffs' son, a decision, the Second Circuit held, the defendant administrators made as private entities rather than as state actors, notwithstanding a state statute regulating the operation of the home.

The instant case stands on the same footing. The specific conduct of which Plaintiff complains is the arrest of E., her son. McCain and his CREC colleagues made their decisions to report the threatening e-mail to the police and answer the police requests for further information as private individuals rather than state actors, notwithstanding state statutes regulating the operation of the School. As in *Sybalski*, the case at bar does not fall within § 1983.

## V

Before leaving the subject of Connecticut statutes, it is notable that Plaintiff's briefs cite a number of cases asserting claims against a "regional education service center" ("RESC"), like Defendant Capitol Region Education Council ("CREC"), for the proposition that the CREC Defendants are state actors. CREC and the RESCs in the cited cases were established by the same Connecticut General Statutes cited and quoted in Part C. IV, *supra*. Unlike the case at bar, however, no case cited by counsel for either party involves a claim for false arrest by police officers coupled with an effort to impose § 1983 liability for the same arrest upon an RESC, on the theory that the private entity was either a state actor or acted under color of state law. Nonetheless, counsel purport to derive helpful (if opposing) principles from these additional cases, which I consider in this Part.

*Pompoukidis v. Education Connection*, No. CV 960335425S, 1998 WL 707814 (Sup. Ct. Conn. Oct. 1, 1998), was a negligence action against an RESC for injuries suffered by a child while attending a play program conducted by the defendant. "The defendant argues that it is a regional education service center pursuant to General Statutes § 10-66, and therefore it is a state actor." *Id.* at *1.[11] The RESC in *Pompoukidis* further contended that "as a state actor, it enjoys sovereign immunity unless it consents to be sued." *Id.* The Connecticut Superior Court pointed to Gen. Stat. § 10-66c, providing that "A regional educational service center shall be a public educational authority acting on behalf of the state of Connecticut," and concluded: "Accordingly, the defendant is an agent of the state, and therefore may raise the defense of sovereign immunity." *Id.* The court

---

[11]   The contention by the RESC in *Pompoukidis* that it *is* state actor may be contrasted with that of CREC, the RESC in the case at bar, which *denies* it is a state actor for purposes of a § 1983 action for false arrest. A cynic might conclude that an RESC's perceptions on the issue depend more upon the exigencies of advocacy than upon principle.

dismissed the action for lack of subject matter jurisdiction. *Id.*

*Sanchez v. Capitol Region Education Council*, No. CV 000598554, 2001 WL 420475 (Sup. Ct. Conn. April 6, 2001), was another negligence action for injury suffered on an RESC's property. The RESC sued in *Sanchez* was CREC, the same educational service center sued in the case at bar. On a motion to dismiss the *Sanchez* complaint, the Superior Court posed the first issue as "whether CREC is protected by the doctrine of sovereign immunity," 2001 WL 420475, at *2, and held that "as a RESC, CREC is a state actor. As a state actor, CREC is shielded by sovereign immunity unless it is waived." *Id.* (citing and quoting *Pompoukidis*). The *Sanchez* court dismissed the complaint on the ground of CREC's sovereign immunity. *Id.*

CREC was also sued in *Austin v. Greater Hartford Academy of the Arts, et al.*, No. HHDCV156058258S, 2016 WL 4497660 (Sup. Ct. Conn. July 19, 2016), where a negligence action was brought to recover for injuries suffered by a child struck by an automobile while leaving school grounds outside of school hours. The plaintiff alleged that CREC, one of several defendants, managed the school where the accident occurred, and was under the same statutory duty as that charged in the instant case: to provide "a safe school setting." CREC moved to dismiss the case against it on the ground of sovereign immunity. The Superior Court granted that motion and dismissed the action against CREC. The court accepted without discussion CREC's entitlement in principle to the sovereign immunity defense. The defense succeeded because the court rejected plaintiff's reliance upon "the imminent harm, identifiable victim exception to governmental immunity," and held that the "supervision of students" is a "discretionary function, not a ministerial function, and the imminent harm, identifiable victim exception does not apply because the plaintiffs were not compelled to be where they were when the accident occurred outside school hours." 2016

WL 4497660, at *1.

These were common law personal injury negligence actions in Connecticut trial courts against regional educational service centers created by Connecticut statutes. In their briefs on the present motion, counsel also cites cases in this Court involving RESCs as defendants. Those cases assert claims for violations of the Constitution or federal statutes.

In *St. Ledger v. Area Cooperative Educational Services*, 228 F. Supp. 2d 66 (D. Conn. 2002), the plaintiff was employed in a supervisory capacity by defendant Area Cooperative Educational Services ("ACES"), a regional educational service center which placed children with special needs in programs and staffed those programs. Plaintiff sued ACES and two of its officers in this Court pursuant to § 1983, alleging that defendants retaliated against her in violation of the First Amendment, deprived her of the equal protection of the laws, and violated the federal Rehabilitation Act. On defendants' motion for summary judgment, District Judge Droney (as he then was) posed the threshold question as "whether ACES and the two individual defendants engaged in state action and are thus subject to First Amendment restrictions." 228 F. Supp. 2d at 70. Judge Droney reviewed the provisions in Conn. Gen. Stat. § 10-66c and held: "In light of ACES' close and substantial 'entwinement' with the State, the Court concludes that ACES and the individual defendants were engaged in 'state action' when they allegedly violated [plaintiff's] constitutional rights." *Id.* (citing and quoting *Brentwood,* 531 U.S. at 302). Judge Droney granted defendants summary judgment because plaintiff's claims failed on the merits.

Several years later, Judge Burns filed two opinions, one in each of two consolidated cases in which CREC (the defendant RESC at bar) was the RESC sued under § 1983 for First Amendment violations: *Bogle-Assegai v. Bigelow, et al.*, Nos. 3:01-CV-2366 and 3:01-CV-2367, 2005 WL

8159145 (D. Conn. Feb. 10, 2005) ("*Bigelow I*"), and 2007 WL 3216393 (D. Conn. Oct. 25, 2007) ("*Bigelow II*"). The cases arose when the plaintiff, a high school student, was discharged from a summer program conceived and implemented by CREC and conducted by the faculty and on the campus of Central Connecticut State University ("CCSU"). Administrators of CREC and CSSU discharged plaintiff for her disruptive conduct. Plaintiff filed § 1983 actions against both entities and the individuals involved, alleging that they discharged plaintiff in retaliation for her protected political speech. In *Bigelow I*, Judge Burns held that under the General Statute provisions for regional education service centers, "as an agent of the State, CREC is entitled to the same immunity as the State." 2005 WL 8159145, at *2. However, the resolution of these cases did not turn on immunity. *Bigelow I* granted the motions of CREC and CCSU for summary judgment because of the lack of merit of plaintiff's underlying claims.

The *Bigelow* litigation acquired greater relevance to the case at bar when, after Judge Burns' ruling on summary judgment, the State of Connecticut (appearing through counsel other than the attorneys for CREC) filed a motion to amend that ruling. Judge Burns granted the State's motion to amend her ruling in the opinion I have called *Bigelow II*. Specifically, Judge Burns noted that in *Bigelow I* she held "Defendants Capitol Region Education Council ('CREC'), a Regional Education Service Center ("RESC") and Mark O'Donnell, as an employee of CREC, were agents of the State and entitled to the same immunity as the state." *Bigelow II*, 2007 WL 3216393, at *1. The State of Connecticut's motion to amend that ruling asserted that "under the rules of determining when an entity acts as an arm of the state for sovereign immunity purposes, as set forth by the Connecticut Supreme Court and the Second Circuit, CREC is not a state entity or agent of the state." *Id.*

Judge Burns agreed with the State. She concluded: "The Court amends its ruling in order to make it consistent with the rules on determining when an entity acts as an 'arm of the state,' as set forth by the Connecticut Supreme Court in *Gordon v. H.N.S. Management Co.*, 272 Conn. 81 (2004) and by the Second Circuit in *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996)." *Bigelow II*, 2007 WL 3216393, at *1. Judge Burns reasoned that the CREC, an RESC, did not meet the *Gordon* tests for state agency for reasons derived from provisions in Gen. Con. § 10-66(a) *et seq.*, including those in §§ 10-66a and 10-66c that "an RESC is a 'body corporate and politic' created by local boards of education, not by the state." *Bigelow II* also concluded that applying the factors recited in *Mancuso*, "it is clear that RESCs cannot be considered arms of the state under Second Circuit caselaw." *Id.* at *2. Accordingly, Judge Burns granted the State's motion to amend *Bigelow I*. She issued an "amended factual finding" that CREC and O'Donnell "are not arms of the state entitled to assert sovereign immunity." *Id.*[12]

In *Turner v. Eastconn Regional Education Service Center*, No. 3:12-cv-00788, 2013 WL 1092907 (D. Conn. March 15, 2013), plaintiff was an employee of Eastconn, an RESC, whom she filed suit against for "a plethora of violations of federal and state employment laws as well as several state contract and tort claims relating to the circumstances involving her leave and then termination from employment following a difficult pregnancy." *Id.* at *1. One claim, asserted under the Connecticut State Personnel Act, required plaintiff to show that Eastconn should be regarded as a state agency. On a motion to dismiss, Judge Bryant dismissed that claim: "This Court agrees with

---

[12] Judge Burns was careful to note that this amendment "does not change its decision granting summary judgment on all counts in favor of Defendants, because the Court's reasoning did not rely on a finding that Defendants enjoyed sovereign immunity." 2007 WL 3216393, at *2.

the [*Bigelow II*] court's analysis that an examination of the entire structure of the RESC act does not support a conclusion that RESCs were intended to be construed as state agencies." *Id*. at *14. Judge Bryant recognized that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action," but declined to apply that principle to the facts in *Turner*. *Id.* (citing and quoting *Fabrikant*).

The brief for Plaintiff on this motion cites these cases and says of them: "[A] body of both state and federal case law have held CREC is a governmental body, and its employees are municipal workers and CREC has been subjected to liability under 42 U.S.C. § 1983 as a state actor . . . . This interpretation has led to other state and federal courts to hold RESCs are state actors." Doc. 69 at 9, 11. Given what the cited cases actually held, this collective characterization of them is inaccurate.

In *Bigelow II* the State of Connecticut itself succeeded in persuading Judge Burns that CREC was *not* a state agency, a holding with which Judge Bryant agreed in *Turner*. Judge Droney reached a seemingly contrary conclusion in *St. Ledger*, but as Judge Bryant observed in *Turner,* "the *St. Ledger* court did not examine whether a RESC was a state actor but simply held that a RESC's conduct could be considered state action subjecting a RESC to liability for constitutional torts." 2013 WL 1092907, at *14. Moreover, *St. Ledger* was decided in 2002. The Connecticut Supreme Court decided *Gordon* in 2004, 272 Conn. 81, noting in its opinion at 93: "This court previously has not had the opportunity to consider what factors are relevant to a trial court's determination of whether an entity with the attributes of a private corporation may, as an 'arm of the state,' raise a sovereign immunity defense." The criteria the Court then listed in *Gordon* were applied to CREC by Judge Burns in *Bigelow II*, 2007 WL 3216393, at *1, where she held that CREC, as a RESC,

"does not meet the *Gordon* test" for state agency status: "RESCs are not state agencies, nor are they treated as such." *Id.* That is the proposition with which Judge Bryant agreed in *Turner.* Thus the line drawn from *Gordon* through *Bigelow II* to *Turner* leads to the conclusion that, contrary to Plaintiff's professed characterization, CREC is not a state agency, and consequently not a state actor by reason of statute or caselaw. *Quaere* whether Judge Droney would have reached the unreasoned conclusion he did in *St. Ledger* if the state Supreme Court had previously issued its opinion in *Gordon.*

I need not pursue this question further. While CREC, as an RESC, was regulated to some degree by Connecticut statutes, the Second Circuit instructs district courts in *Sybalski* that this statutory involvement by the state in CREC's activities does not, standing alone, render CREC a state actor in "the activity that caused the injury giving rise to the action," 546 F.3d at 258: in this case, false arrest. Nor do the statute's provisions make McCain's conduct (calling 911 and answering the police's requests for information) fairly attributable to the state government. The state actors in this case were the Hartford police officers who arrested, handcuffed and interrogated E. The police responded to and acted upon a call from and information supplied by private parties who, by the clear weight of authority, did not thereby subject themselves to liability under § 1983.

## VI

Plaintiff Ortolaza also contends that, independent of the state statutes in question, Defendants McCain, Nolan and Sullivan acted jointly with the HPD to such an extent that the school administrators, in addition to the police officers, should be regarded as state actors in the arrest of E.

A number of Second Circuit cases define the "joint action" a plaintiff must show in order to

characterize a private entity's conduct as "state action" when an arrest is made by police. In *Vlach v. Staiano*, 604 F. App'x 77 (2d Cir. 2015), the Second Circuit said:

> To hold a private individual like Staiano liable for false arrest under § 1983 and New York law, a plaintiff must show that the defendant took an active role in the arrest of the plaintiff, such as giving advice and encouragement or importuning the authorities to act, and that the defendant intended to confine the plaintiff. Liability may attach only when the defendant has "affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition."

*Id.* at 78 (citing and quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13-14 (2d Cir. 1998)). This approach conforms with prior Second Circuit decisions. *See also King*, 111 F.3d at 257 ("To hold a defendant liable as one who affirmatively instigated or procured an arrest, a plaintiff must show that the defendant or its employees did more than merely provide information to the police."); *Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 39 (2d Cir. 1985) (comments of private individual "fall short of a request that Raysor be arrested or prosecuted, the *minimal action* necessary to sustain a claim for false arrest or malicious prosecution." (emphasis added)); *Rosario v. ALGWU*, 605 F.2d 1228, 1248 (2d Cir. 1979) (noting "distinction between merely making statements that certain facts exist and leaving it to the authorities to decide whether to make an arrest and requesting or directing that someone be arrested."); *cf. Rothstein v. Carriere*, 373 F.3d 275, 293-94 (2d Cir. 2004) ("[R]eporting a crime to law enforcement does not constitute the 'initiation' of a criminal prosecution"; the complainant "must have played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.").

The actions of McCain, Nolan, and Sullivan as alleged in the Amended Complaint, viewed separately or together, do not satisfy the Second Circuit criteria for the sort of joint action that would

justify a § 1983 action against private individuals involved in an arrest executed by police officers. The "specific conduct of which the plaintiff complains" is the arrest of E. by Hartford police officers, with E's attendant handcuffing and interrogation. These events occurred during a brief period of time, beginning "at approximately 6:00 a.m." on November 19, 2015, A.C. ¶ 62, when McCain read the threatening e-mail which prompted his 6:21 a.m. phone call to the HPD, and ending shortly afterward that morning, when E. was "released into his parents' custody after being arrested for approximately 55 minutes," *id.* ¶ 215. According to the allegations of the Amended Complaint, during that brief period the school administrators read the threatening e-mail; notified the HPD by phone about the e-mail; gave the HPD information about E. that suggested he might be the author; directed the school bus to go to the location where the police arrested E.; and, in McCain's case, entered the room where the police were interrogating E. and asked some questions about the 'reckoning' e-mail. *Id.* ¶ 190. Those minimal acts on the part of the private individuals do not amount to instigation of or joint participation with the police in the arrest of E., as those concepts are defined by the cases. McCain and his CREC colleagues did no more than report the e-mail to the police and provide additional factual information by answering police questions. It was for the police to decide whether to arrest E. They decided to do so. Police boarded the school bus alone, arrested E., handcuffed him, transported E. in a police cruiser to the School, and interrogated him there. In these circumstances, E.'s arrest cannot be regarded as the result of joint action by the Hartford police and the private-individual school administrators.

This case differs in that regard from *Mara v. MacNamara, supra*, where Cleary, the private individual involved, was a university security officer who was present at the plaintiff's arrest, personally participated in the arrest, and drove the plaintiff and town police to the university security

office for interrogation. Judge Chatigny interpreted the complaint in *Mara* as alleging that "Cleary [a peace officer himself] participated alongside Town officers in making an arrest and was therefore directly involved in the alleged constitutional violation." 2015 WL 4392956, at *4. Those facts allowed plaintiff's federal claim against the private entities to survive a motion to dismiss. Such circumstances are not present in the case at bar.

The Amended Complaint alleges the school administrators intended that E. be arrested. I am not bound to accept that conclusory and argumentative characterization of the CREC Defendants' mental state. In any event, the existence *vel non* of joint action in the arrest depends upon the defendants' conduct, and under the clear weight of authority, that conduct does not support finding the school administrators were joint actors with the arresting police officers.[13]

## CONCLUSION AND ORDER

I conclude that the CREC Defendants' motion to dismiss Plaintiff's Amended Complaint against them must be granted.

The Amended Complaint suffers from the same infirmities with respect to the CREC Defendants as did the initial Complaint, which was dismissed as to those Defendants for the reasons stated in the May 7 Ruling. Plaintiff's federal claim against these school administrator Defendants

---

[13] It is worth noting at this juncture that the May 7 Ruling stated: "Plaintiff's complaint complaint nowhere alleges or suggests that the CREC Defendants did not themselves *believe* (however mistakenly) that E. sent the e-mail when those individuals communicated with the HPD, or that they intended to involve the police in a joint effort to prosecute the innocent." 2018 WL 2100289, at *10. The Amended Complaint is similarly devoid of such allegations. In this regard, the A.C. alleges, with seeming disapproval, that McCain mentioned to police "the alleged prior statements by E. about his alleged access to firearms." A.C. ¶ 85. However, Plaintiff does not deny in the A.C. that E. made the statements ascribed to him to by school administrators about his possession and knowledge of firearms; nor can McCain reasonably be faulted for mentioning E.'s assertions to the police when they asked him if he could think of possible authors of the threatening e-mail.

based upon 42 U.S.C. § 1983, as alleged in the amended pleading, fails because these Defendants cannot be regarded as state actors, or as having acted under color of state law, in connection with the arrest of Plaintiff's son E. by the Hartford police. The police were state actors; they arrested E. under color of state law; the arrest resulted from information communicated to the police by the school administrators. Those facts may be acknowledged, but they fall well short of establishing the CREC Defendants as state actors, or as joint actors with the police in making the arrest. The school administrators and the police were not working together in furtherance of a state-enforced prohibited purpose (that being the *Adickes* touchstone of a private entity's § 1983 liability). The CREC Defendants did not instigate E's arrest by knowingly conveying false information about him to the HPD. McCain's initial 911 call to the police about the threatening e-mail, and information subsequently given by the school administrators to the police in response to pre-arrest police inquiries, do not take this case out of the line of cases which hold consistently that such conduct does not impose § 1983 liability upon a private entity by transforming that entity into a state actor. The state statutory references to educational entities such as CREC do not alter that conclusion with respect to the CREC Defendants' status as private individuals in this false arrest case.

The Court's Ruling on this motion to dismiss Plaintiff's Amended Complaint will mirror the May 7 Ruling dismissing the initial Complaint. Plaintiff's federal claims under § 1983 against the CREC Defendants will be dismissed for failure to state a claim, this time without leave to replead. As for Plaintiff's state law claims against those Defendants, the Court again declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367, and those claims will again be dismissed without prejudice.

Assuming, without deciding or intimating, that as Plaintiff has always contended, her son

had nothing to do with sending to the School the "reckoning" e-mail that set this whole unhappy chain of events in motion, E. was wronged by his arrest and attendant humiliation, and the injury to the entire family is a serious one. Because this Court's dismissal of the state law claims is without prejudice, Plaintiff and her family may avail themselves of any remedies that may be available to them under Connecticut statutory law or common law, in a Connecticut court of competent jurisdiction.

For the foregoing reasons, the Court makes this Order:

1. The motion [Doc. 65] of Defendants Capitol Region Education Council, Robert McCain, Timothy Sullivan, and Christopher Nolan to dismiss the Plaintiff's Amended Complaint [Doc. 53] as to those Defendants is **GRANTED**.

2. Counts I, II, III, V, VIII, and XI are **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO REPLEAD**.

3. Counts XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, and XXI are **DISMISSED WITHOUT PREJUDICE**.

4. The remaining Counts in the Amended Complaint, against other Defendants of record, are not affected by this Order.

It is **SO ORDERED**.

Dated:  New Haven, Connecticut
          May 23, 2019


                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge